**ROBERT T. EGLET, ESQ.**
Nevada Bar No. 3402
**ROBERT M. ADAMS, ESQ.**
Nevada Bar No. 6551
**CASSANDRA S.M. CUMMINGS, ESQ.**
Nevada Bar No. 11944
**RICHARD K. HY, ESQ.**
Nevada Bar No. 12406
**EGLET PRINCE**
400 South Seventh Street, Suite 400
Las Vegas, Nevada 89101
Telephone:  (702) 450-5400
Facsimile:  (702) 450-5451
Email: eservice@egletlaw.com

**JONATHAN E. LOWY, ESQ.**
*(Admitted Pro Hac Vice)*
District of Columbia Bar No. 418654
**BRADY CENTER TO PREVENT GUN VIOLENCE**
840 1st Street, NE, #400
Washington, DC 20002
Telephone:  202-370-8104
Email: jlowy@bradymail.org
*Attorneys for Plaintiffs*

**DISTRICT COURT**

**CLARK COUNTY, NEVADA**

| | |
|---|---|
| DEVAN PRESCOTT, individually and on behalf of all those similarly situated; BROOKE FREEMAN, individually and on behalf of all those similarly situated,<br><br>    Plaintiffs,<br><br>vs.<br><br>SLIDE FIRE SOLUTIONS, LP, a Foreign Corporation; DOE MANUFACTURERS 1 though 100, inclusive; ROE RETAILERS 1 though 100, inclusive.<br><br>    Defendants. | Case No.: 2:18-cv-00296-GMN-GWF<br><br>**FIRST AMENDED CLASS ACTION**<br><br>**COMPLAINT** |

EGLET ♦ PRINCE

1

Plaintiffs, individually and on behalf of all those similarly situated, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge.

**I.**

**INTRODUCTION**

1.     Plaintiffs bring this action as a class action on behalf of themselves and on behalf of all persons who tragically suffered emotional distress as a result of the shooting that occurred during the Route 91 Harvest Music Festival on October 1, 2017 in Las Vegas, Nevada.

2.     The damage suffered by Plaintiffs was wrought by a civilian who engaged in a military-style assault from long range, shooting rapidly and repeatedly from a quarter of a mile away into a crowd.  This horrific assault did not occur, could not occur, and would not have occurred with a conventional handgun, rifle, or shotgun, of the sort used by law-abiding responsible gun owners for hunting or self-defense.  The damage caused to Plaintiffs resulted from the military-style arsenal that Defendants manufactured, marketed, and sold to the general public, without any reasonable measures or safeguards, and which the killer foreseeably used to such horrific results.  Hence this lawsuit.

3.     For over 80 years, under the National Firearms Act ("NFA"), automatic-fire guns have been greatly restricted in the United States, and not readily available to the general public like most conventional handguns, rifles, and shotguns.  That is because of a widespread recognition that automatic fire weaponry – "machine guns" – is designed to kill as many people as quickly as possible, and thus belongs on the battlefield, not on our streets or communities. Defendants made and sold a "bump stock" despite indicia that it would be used, with firearms and ammunition, for unlawful purposes.

2

4.     This lawsuit does not in any way challenge the right of law-abiding citizens to bear arms. This lawsuit also does not challenge in any way the right of responsible companies to operate a business of selling guns or lawful accessories to law-abiding citizens. This lawsuit is about the negligent sale and marketing of a product intended to circumvent and subvert federal firearms law in a manner that facilitates criminal acts, such as the massacre of October 1. Negligence supplying of such dangerous products not only causes foreseeable harm (such as the shooting incidents underlying this case), it unfairly tarnishes the right of all law abiding citizens to bear arms for lawful purposes, including protection, hunting, or other recreational activities.

5.     As a direct result of Defendants' negligence, 58 people were shot and killed and hundreds were injured, and thousands more suffered emotional distress as alleged herein.

6.     Defendants should never have sold their bump stocks to the general public, for several independent reasons, including that:  federal law has recognized since at least 1934 that automatic fire weapons should not be sold to the general public, absent strict NFA regulation; the NFA, properly construed and applied, does not allow bump stocks for that reason; and Slide Fire engaged in intentional misrepresentations to obtain governmental permission to sell bump stocks, and then trumpeted that deceptively-obtained approval in marketing those devices.

7.     The Las Vegas massacre has led to a recognition of the grave danger posed by bump stocks and the federal government's reassessment of their legality. Since the shooting, the United States Justice Department has recognized that under federal law, as it has existed from before Slide Fire began selling bump stocks, the definition of a "machinegun" in the ATF regulations should include bump stocks, so as effectively to ban their manufacture and sale to the general public outside of National Firearms Act regulations.[1] On March 23, 2018, United States Attorney General Jefferson Sessions announced that the Department of Justice had issued a

---

[1] *See infra*, ¶¶ 26-28.

Notice of Proposed Rulemaking to amend ATF regulations to "clarify[] that bump stocks fall within the definition of 'machinegun' under federal law, as such devices allow a shooter of a semiautomatic firearm to initiate a continuous firing cycle with a single pull of the trigger."[2] Federal law prohibits the transfer or possession of machineguns by civilians, absent the extensive regulation required under the National Firearms Act.

8.      President Trump assured Americans that the sale of bump stocks to the public would be banned within the "next couple of weeks" on October 1, 2018, the one-year anniversary of the Las Vegas shooting.[3]    Nine states—California, Connecticut, Florida, Maryland, Massachusetts, New Jersey, Rhode Island, Vermont, and Washington—have not waited for federal action and have enacted laws banning bump stocks,[4] eight of them directly in response to the Las Vegas shooting.

9.      On the night of October 1, 2017, Stephen Paddock opened fire onto unsuspecting individuals, while perched from the 32nd floor of his hotel room at the Mandalay Bay.

10.      Paddock brought to his hotel room in excess of a dozen rifles and hundreds of rounds of ammunition.

11.      The rifles were equipped with a "bump stock" — a device that attaches to a rifle allowing it to shoot at a rate comparable or equivalent to that of a fully automatic weapon.

12.      In approximately 11 minutes, 58 people were killed, hundreds of people were injured, and thousands suffered emotional distress.

13.      The number of lives lost, and people injured and emotionally traumatized in approximately 660 seconds, was made possible by the use of "bump stock" devices that allowed Paddock to fire hundreds of rounds per minute.

---

[2] https://www.justice.gov/opa/pr/attorney-general-sessions-announces-regulation-effectively-banning-bump-stocks.
[3] Betsy Klein & Laura Jarrett, *Trump says ban on 'bump stocks' coming*, CNN (Oct. 2, 2018, 4:41 AM), https://www.cnn.com/2018/10/01/politics/trump-bump-fire-stocks/index.html.
[4] *See infra*, ¶ 29.

14.    Upon information and belief, and at all times relevant hereto, the "bump stock" devices used by Paddock were manufactured, marketed and/or distributed by Slide Fire Solutions, LP.

15.    Upon information and belief, in 2010, Slide Fire wrote to the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") requesting that ATF evaluate its "bump stock" device. ATF responded by a letter dated June 7, 2010 (the "ATF Letter"). The ATF Letter expressly stated that Slide Fire "advises that the stock (referenced in this reply as a 'bump stock') is intended to assist persons whose hands have limited mobility to 'bump-fire' an AR-type rifle" and concluded that "we find that the 'bump-stock' is a firearm part and is not regulated as a firearm under the Gun Control Act or the National Firearms Act." [5]

16.    Thus, upon information and belief, in requesting that ATF evaluate its device, Slide Fire knowingly misrepresented that the purpose for which the bump stock was designed was to assist people with difficulty using their hands to fire.  Upon information and belief, Slide Fire made this misrepresentation so that ATF would allow it to sell its bump stock devices without the legal restrictions required of "machineguns" or parts that transform a rifle into a "machinegun."  If ATF had not considered Slide Fire's assertion regarding persons with disabilities to be material to its decision not to apply NFA regulations or Gun Control Act regulations to "bump stocks," it would not have included this assertion in the response letter.

17.    Upon information and belief, on a previous version of the home page of its website, Slide Fire posted the legend 'ATF Approved' with a link sending Internet visitors directly to the ATF Letter as shown below.[6]

---

[5] Slide Fire has failed to provide a copy of its initial letter to the ATF, so Plaintiffs can only rely upon the portion of Slide Fire's letter that the ATF described in ATF's response.
[6] *See* Slide Fire Website (Apr. 21, 2018), Internet Archive Wayback Machine, https://web.archive.org/web/20180421090809/https://slidefire.com/ (last visited Sept. 30, 2018); *see also United*

18.     Slide Fire did not mention it was not "approved" by ATF, and that any purported 'ATF Approv[al]' was obtained through a false claim that its device was intended for those with limited mobility in their hands.



19.     Further, under the "Legality and Purchasing" section of the Frequently Asked Questions page on Slide Fire's website, which is still accessible to visitors this day, Slide Fire includes the question:  "1. ARE THE SLIDE FIRE® STOCK SYSTEMS LEGAL IN MY STATE?" In response, Slide Fire states:  "Slide Fire® products have been approved by the Bureau of Alcohol, Tobacco, Firearms and Explosives (BATFE) and we provide a copy of the approval letter on our website www.slidefire.com to any interested individual."[7]

20.     The statements of Jeremiah Cottle, Slide Fire's inventor of bump stocks, suggest that his true purpose in designing the bump stock was not to facilitate shooting by disabled users, but instead to enable able-bodied users to shoot rapid-fire style.  Cottle has stated that the bump stock was geared toward "people like me, [who] love full auto."

_States v. Gasperini_, 894 F.3d 482, 490 (2d Cir. 2018) (finding admissible evidence from the Internet Archive's Wayback Machine, which "captures and preserves evidence of the contents of the internet at a given time").

[7] Slide Fire, Frequently Asked Questions, https://slidefire.com/faq/ (last visited Sept. 30, 2018).



YOUR RIFLE IS HUNGRY, FEED IT [8]

21.     Plaintiffs are unaware of any marketing, advertising, or other materials by Slide Fire that supports the claim that it actually was intended for people whose hands had limited mobility.

22.     In fact, Slide Fire's own marketing materials and advertisements belie any notion that bump stock devices are intended for the use of persons with limited mobility.  Rather, these materials promote bump stock devices as allowing shooters to use weapons with machinegun-like capabilities.  For instance, Slide Fire's own catalog states that "Rapid fire capabilities can add fun to your shooting sessions, and can really take your rifle to the next level."

23.     That the true purpose of "bump stocks" is to enable able-bodied individuals to approximate the rate of fire of an automatic weapon is further supported by the language in in the patents "bump stocks" patents on which Cottle is named as an inventor, and Slide Fire, as an assignee.  These include, U.S. Pat. No. 9,546,836 (the "'836 patent"); U.S. Pat. No. 8,607,687 (the "'687 patent"); and U.S. Pat. No. 8,356,542 (the "'542 patent").

24.     Each patent contains a section that provides a summary of the invention and lists the advantages of the technology over prior art;  these patents do not list improving ease of

---

[8] Slide Fire Solutions Catalog on October 6, 2017 at http://www.slidefire.com/files/SF-2016-WEB.pdf.  Further, on February 23, 2018, Slide Fire filed a copy of its own catalog as an exhibit to its motion to dismiss in this action. *See* Ex. B to Slide Fire's Motion to Dismiss, ECF No. 8-3 at 17.

operation for disabled shooters as an advantage--or even a primary function--of the devices. *See* '836 at 3:8-33; '687 patent at 3:7-36; '542 patent at 3:6-36.

25. Instead, the primary advantages/functions of the bump stock devices listed in the patents are: 1) to increase the "enjoyment and excitement" of shooting firearms (*see* '836 patent at 3:29-33; '687 patent at 3:32-36; '542 patent at 3:32-26); and, critically 2) to *enhance the firing rate of a semi-automatic weapon. See* '836 patent at 3:27-29 ("The present invention allows the operator of a semi-automatic firearm *to switch between modes of rapid repeat firing and standard semi-automatic firing.*") (emphasis added); '542 patent at 3:29-32 (when attached to a semiautomatic weapon, the device allows the operator to "establish a stable platform with which to *rapidly repeat fire* their firearm") (emphasis added).

26. Plaintiffs are unaware of any measures taken by Slide Fire to ensure that bump stocks would only be sold to persons whose hands had limited mobility, or even to see if persons buying bump stocks who were not limited in mobility had any legitimate reason to buy them.

27. With respect to bump stocks, Michael Bouchard, former Assistant Director of the Bureau of Alcohol, Tobacco Firearms and Explosives has said, "it serves no purpose for anything[.] Not for sporting, not for target practice, not for hunting."[9]

28. Upon information and belief, the gun range located at the National Rifle Association Headquarters in Fairfax, Virginia does not allow the use of bump stocks.[10]

29. Paddock could not have injured so many people without a bump stock. Paddock may not have launched his military-style assault without a bump stock. There are people who

---

[9] Washington Post article dated October 5, 2017, "NRA Support for Restricting 'Bump Stocks' Reflects Impact of Las Vegas Massacre."

[10] Huffington Post article dated October 6, 2017, "Gun Stores Selling out of Bump Stocks After Shooter used them in Las Vegas Massacre."

were killed, injured, and suffered emotional distress who would not have been, if Paddock had not possessed a bump stock.

## II.

## PARTIES

30.     Plaintiffs were attendees of the Route 91 Harvest Music Festival.

31.     That Plaintiff DEVAN PRESCOTT is, and at all times relevant hereto, was a resident of the State of Nevada.

32.     That Plaintiff BROOKE FREEMAN is, and at all times relevant hereto, was a resident of the State of Nevada.

33.     Plaintiffs are informed and believe and thereupon allege that Defendant Slide Fire Solutions, LP ("Slide Fire") is a foreign limited partnership, with its principal place of business located in Moran, Texas.

34.     Defendants DOE MANUFACTURERS are all manufacturers of bump stocks or similar devices.  DOE MANUFACTURERS include designers, developers, promoters, and/or marketers of bump stocks or similar bump fire devices.

35.     Defendants ROE RETAILERS are all retailers of bump stocks or similar devices. ROE RETAILERS include sellers, retailers, wholesalers, suppliers, and/or distributors of bump stocks or similar bump fire devices.

36.     That the true names and capacities, whether individual, corporate, associate, or otherwise, of the Defendants herein designated as DOE MANUFACTURERS and/or ROE RETAILERS are unknown to Plaintiffs at this time who therefore sue said Defendants by fictitious names.  Plaintiffs allege that each named Defendant herein designated as DOE and/or ROE is negligently, willfully, contractually, or otherwise legally responsible for the events and happenings herein referred to and proximately caused damages to Plaintiffs as herein alleged.

9

Plaintiffs will seek leave of Court to amend this Complaint to insert the true names and capacities of such Defendants when same have been ascertained and will further seek leave to join said Defendants in these proceedings.

37.    That Plaintiffs are informed and believe and thereon alleges that at all times mentioned herein, Defendants and each of them, including those names as DOES and ROES were agents, servants, employees, partners, distributors or joint venturers of their Co-Defendants and that in doing the acts herein alleged, were acting within the course and scope of said agency, employment, partnership, or joint venture. Each and every Defendant aforesaid was acting as a principal and was negligent or grossly negligent in the selection, hiring and training of each and every other Defendant or ratified the conduct of every other Defendant as an agent, servant, employee or joint venturer.

38.    That the true names and the capacities, whether individual, agency, corporate, associate or otherwise, of Defendant DOE MANUFACTURERS 1 through 100, inclusive, are unknown to Plaintiffs. Plaintiffs will ask leave of the Court to amend this Complaint to show the true names and capacities of these Defendants, when they become known to Plaintiffs. Plaintiffs believe each Defendant named as DOE was responsible for contributing to Plaintiffs' damages as set forth herein.

39.    That the true names and the capacities, whether individual, agency, corporate, associate or otherwise, of Defendant ROE ENTITIES 1 through 100, are unknown to Plaintiffs. Plaintiffs will ask to leave of the Court to amend this Complaint to show the true names and capacities of these Defendants, when they become known to Plaintiffs. Plaintiffs believe each Defendant named as ROE was responsible for contributing to Plaintiffs' damages as set forth herein.

40.     That Plaintiffs are informed and believe, and based upon such information and belief, allege that each of the Defendants herein designated as DOES and/or ROES are in some manner responsible for the occurrences and damages sustained as alleged herein.

## III.

## JURISDICTION AND VENUE

41.     That exercise of the jurisdiction by this Court is appropriate because all incidents described herein occurred in the County of Clark, State of Nevada.

42.     That this Court has jurisdiction over the subject matter of this action. That exercise of the jurisdiction by this Court over each and every Defendant in this action is appropriate because each and every Defendant has done, and continues to do, business in the State of Nevada, and committed a tort in the State of Nevada.

43.     Additionally, this Court has jurisdiction over the claims alleged herein as they arise under Nevada statutes and Nevada common law.

44.     Jurisdiction in Nevada is reasonable given Plaintiffs' and Nevada's robust interests in adjudicating the instant case in this forum.

## IV.

## GENERAL ALLEGATIONS

45.     Plaintiffs repeat and reiterate the allegations previously set forth herein.

46.     Between September 28 and October 1, 2017, the Route 91 Harvest Festival (the "Festival") was held in Las Vegas, Nevada. The Festival is a three-day outdoor music event held at the south end of the Las Vegas Strip near or around the Mandalay Bay Hotel. Attendees were required to purchase tickets and pass through security before entering the Festival grounds.

11

47.     On the night of October 1, 2017, country music star Jason Aldean was on stage at the Festival when Stephen Paddock opened fire onto the unsuspecting concertgoers while perched from the 32nd floor of his hotel room at the Mandalay Bay.

48.     Upon information and belief, and at all times relevant herein, Paddock brought to his hotel room in excess of a dozen rifles and hundreds of rounds of ammunition.  The rifles were equipped with a "bump stock" — a device that attaches to a semi-automatic rifle, which allows the rifle to mimic a fully automatic weapon.

49.     With this aftermarket accessory, in approximately 11 minutes, Paddock was able to fire hundreds of bullets and mow down innocent victims.  Because of this device, 58 people died, hundreds were severely injured, in mere minutes, and thousands more sustained emotional distress, making this the worst mass shooting in modern American history.

50.     Upon information and belief, and at all times relevant herein, Slide Fire designed, manufactured, marketed, distributed, and/or sold one or more of the bump stocks used by Paddock during the subject incident.

51.     Upon information and belief, and at all times relevant herein, DOE MANUFACTURER designed, manufactured, marketed, distributed and/or sold one or more of the bump stocks used by Paddock during the subject incident.

52.     Upon information and belief, at the time that Paddock made these purchases, he believed the Slide Fire bump stock device to be lawful, in reliance on the references to the ATF Letter in Slide Fire's marketing.

53.     At all times relevant herein, Slide Fire designed, manufactured, marketed, and/or sold firearm accessories, including sliding rifle gunstocks, more commonly referred to as "bump stocks" or "bump fire stocks" (hereinafter "bump stocks").

54.     Until approximately May 2018, bump stocks were available for purchase from Defendant's website (www.slidefire.com) as well as retailers in Nevada and across the country.

55.     Depending on the model, prices for the bump stocks retailed anywhere from $100 to $400.

56.     Slide Fire held itself out as the "sole patent holder of bump fire technology," owning multiple patents registered with the United States Patent and Trademark Office.

57.     Slide Fire has successfully litigated infringement suits against its competitors to protect its intellectual property.

58.     Upon information and belief, Slide Fire patented its bump fire technology in or around the year 2000.

59.     Upon information and belief, Slide Fire officially took its bump stock product to market on or around Dec. 15, 2010.

60.     Upon information and belief, Slide Fire grossed in excess of $10 million in sales of bump stocks in its first year.

61.     On or around the time Slide Fire's bump stock product went to market, Slide Fire regularly traveled to and attended gun shows in Nevada, with the expectation that its products would be purchased by consumers in our State and elsewhere. On multiple occasions, including in 2016 and 2017, Slide Fire attended, as an exhibitor, the "Shooting, Hunting, Outdoor Trade Show" (a/k/a "SHOT Show") – an annual tradeshow for the shooting, hunting, and firearms industry which is considered one of the largest in the world.

62.     While federal law generally bans the private ownership of any fully automatic weapons manufactured after May 19, 1986, Slide Fire's patented technology transforms, converts, augments, modifies, alters or otherwise enhances certain semi-automatic weapons to fire at a rate comparable or equivalent to a fully automatic weapon.

13

63.     Slide Fire sold conversion kits that convert a semi-automatic rifle into a weapon capable of continuous, rapid fire, thus mimicking an automatic weapon.



64.     Slide Fire's bump stocks were purportedly designed for the disabled and intended to assist persons whose hands have limited mobility using firearms.  However, statements made by Slide Fire inventor, Jeremiah Cottle, and Defendant's marketing suggested otherwise.

65.     Upon information and belief, Cottle was quoted in a publication as saying that the bump stock was "to make bump firing safer and more controlled," and that the product was geared not to a disabled population, but instead to "people, like me, [who] love full auto."[12]

66.     Upon information and belief, Cottle also stated that the average recreational shooter doesn't have access to a class 3 firearm of their very own but Slide Fire's bump stock brings shooters the same full auto experience but without the prohibitive price tag, without the background check and without all of the paperwork.

67.     While a semi-automatic rifle may cost between $800 and $1,200, a fully automatic model can run in excess of $15,000.  According to Cottle:

> "A friend and I were out shooting one day and we weren't able to fire as fast as
> we wanted. We couldn't afford what we wanted – a fully automatic rifle – so I

---

[11] Slide Fire Solutions Catalog on October 6, 2017 at http://www.slidefire.com/files/SF-2016-WEB.pdf
[12] https://www.ammoland.com/2016/08/slide-fire-inventor-jeremiah-cottle/#axzz4uYktG1Ot

started to think about how I could make something that would work and be affordable."[13]

"Most people think that a civilian can't own an automatic rifle, but they can if they have the money and if they go through all the paperwork."[14]

68.     Upon information and belief, and at all times relevant herein, Slide Fire marketed its bump stock as a military-grade accessory for civilians.

69.     If Slide Fire intended bump stocks to be for persons with limited mobility in the hands, Slide Fire and its sellers should have taken measures that only those people obtained bump stocks, and they should have known that if an able person sought a bump stock, it was foreseeable that it would be misused.

70.     A marketing video on Slide Fire's website romantically advertises its bump stocks as "patriotic," depicting a man firing hundreds of rounds into the darkness with a voice narrating in the background:

    "As long as patriots like you kindle its flame, freedom has but one enemy it cannot defeat. And that is negligence…. Jefferson and Paine, Adams, Madison, Mason and Franklin. I think they're looking down right now at us. I think they understand what we're trying to do. What we strive to do."

71.     After the carnage of October 1, 2017, and after the discovery of numerous bump stocks in Paddock's hotel room, Slide Fire suspended new orders placed on its interactive website.   Additionally, Slide Fire also disabled its "Locate a Dealer" section of its webpage disallowing the ability to search for local retailers that sell Defendant's bump stock device.

---

[13] http://www.thealbanynews.net/archives/2443

[14] *Id.*

72.    Upon information and belief, on or about April 17, 2018, Slide Fire announced that it would "cease taking orders for its products and shut down its website" on approximately May 20, 2018.[15] Slide Fire's website currently directs potential bump stock purchasers to RW Arms, where "the remaining inventory is available." Recent investigative reporting has revealed that RW Arms is a Fort Worth-based company whose registered agent, Mark Maxwell, has ties to Slide Fire.[16]  RW Arms received its Certificate of Formation from the State of Texas on April 30, 2018, less than two weeks after Slide Fire announced that it was shutting down.

73.    A spokesperson for the Dallas Field Division of the ATF told an investigative reporter that RW Arms does not have a Federal Firearms License and has not applied for one.[17]

74.    Upon information and belief, after the carnage of October 1, 2017 and after the discovery of numerous bump stocks in Paddock's hotel room, some retailers removed bump stock listings from their respective websites.

75.    Upon information and belief, after the carnage of October 1, 2017, and after the discovery of numerous bump stocks in Paddock's hotel room, some retailers removed bump stock products from their store shelves.

76.    Upon information and belief, after the carnage of October 1, 2017 and after the discovery of numerous bump stocks in Paddock's hotel room, some online advertisers removed, or otherwise censored searches related to bump stocks for sale or purchase on its website.

77.    That as a result of witnessing the carnage and the horrific injuries, of their family, friends and other concertgoers, Plaintiffs, including those similarly situated suffered, and continue to suffer emotional trauma and distress.

---

[15] https://money.cnn.com/2018/04/17/news/companies/slide-fire-bump-stocks-shutting-down-website/index.html.
[16] https://www.thetrace.org/2018/09/bump-stocks-las-vegas-mass-shooting-slide-fire-rw-arms/
[17] *Id.*

78.     That at all times mentioned herein, Defendants, and each of them, acted with fraud, oppression, and/or malice toward Plaintiffs, exhibited an intention and willingness to injure Plaintiffs and/or a conscious disregard for the rights and safety of the Plaintiffs, and each Defendant, should be punished and made an example of by imposition of punitive or exemplary damages in an amount in excess of $15,000.00.

79.     As a direct and proximate result of the Defendants' negligence, the Plaintiffs and the putative Class Members seek, as a remedy all available relief, and equitable relief in the form of the establishment of a court supervised program for medical psychological monitoring for all Class Members at the expense of the Defendants.

80.     The equitable remedy of medical monitoring is appropriate equitable relief for the Defendants' conduct since the prospective medical testing and evaluation would have been completely unnecessary but for the Defendants' negligent and reckless conduct describe herein.

81.     The equitable remedy of medical monitoring is appropriate since it is undisputed in the medical community that there is significant clinical value for the Plaintiffs and the putative Class Members in the early detection and treatment of emotional distress.

82.     That medical mental health monitoring is an appropriate remedy for the actions, inactions, and negligence of Defendants pursuant to *Sadler v. Pacificare of Nevada*, 340 P.2d 264 (Nev. 2014).

83.     That Plaintiffs have been required to retain the services of EGLET PRINCE to prosecute this action and are entitled to attorneys' fees and costs as provided by law.

///

///

///

17

## V.

## ALLEGATIONS RELATING TO INAPPLICABILITY OF PLCAA

84.     A "bump stock" is not a "qualified product" within the meaning of the Protection of Lawful Commerce in Arms Act ("PLCAA"), 15 U.S.C. § 7901, *et. seq.*.  *See* 15 U.S.C. § 7903(4).

85.     "Bump stocks" are firearms "accessories" that do not meet the definition of "qualified products" under PLCAA.

86.     Slide Fire's website also explicitly refers to its bump stocks models as "accessories," stating:

> RW Arms is a leading retailer in some of the most cutting-edge
> technology in the firearms industry.  Starting today, you can now
> pick up remaining Slide Fire® stocks and accessories like
> the SSAR-15® SBS, SSAK-47® XRS, SSAR-15®OGR and
> more!  They continue to bring the latest firearms accessories, as
> well as the industries [*sic.*] leading products, right to your front
> door.

///
///
///
///
///
///
///
///
///
///

EGLET PRINCE



87.   The "SSAR-15®    SBS, SSAK-47®    XRS, SSAR-15®OGR"   labeled   as "accessories" are all "bump stocks."

88.   Slide Fire knowingly violated state and federal law and its violation(s) proximately caused Plaintiffs' injuries in this case.

89.   Upon information and belief, Slide Fire provided false information to the ATF in its 2010 letter, in violation of 18 U.S.C. § 1001(a)(2), which criminalizes the making of false statements or misrepresentations to the government.

90.   Upon information and belief, Slide Fire asserted in the ATF Letter that bump stock devices were intended to assist "persons whose hands have limited mobility," and upon information and belief, this statement is both false and misleading.

19

91.     Upon information and belief, Slide Fire's marketing, advertising, and patents as well as its founder Jeremiah Cottle's statements   all demonstrate that "bump stock" devices were not actually intended for people whose hands had limited mobility or that these devices had that effect.

92.     Slide Fire's knowing violation of 18 U.S.C. § 1001(a)(2) was a direct and proximate cause of the harm for which Plaintiffs seek to remedy in this action, for multiple, independent reasons, including:

(a) ATF would not have approved the "bump stock" for sale outside the stricture of NFA and Gun Control Act restrictions had Slide Fire not purposefully misrepresented  the purposes for which Slide Fire actually intended to make, use and sell the bump stock device—namely, to convert a semi-automatic weapon into one with the capability of a fully automatic weapon.

(b) Upon information and belief, Slide Fire's display of the "ATF Approved" legend on its homepage and its discussion of the ATF letter under the "Legality and Purchasing" section of its FAQ's created the false and misleading impression that the ATF letter was an official approval of the legality of the bump stock.  Upon information and belief, the misleading impression created throughout Slide Fire's website that ATF had reviewed all relevant information and issued a valid opinion declaring Slide Fire's "bump stock' to be "legal" enticed users like Paddock (who only used legally purchased firearms during the October 1, 2017 massacre in Las Vegas[18]) to purchase "bump stock" devices from Slide Fire.

---

[18] https://www.reviewjournal.com/crime/homicides/read-the-final-report-from-las-vegas-police-on-the-oct-1-shooting/.

93.     Upon information and belief, Slide Fire provided false information on its application for a Federal Firearms License, in violation of 18 U.S.C. § 923(d)(1)(D), which governs issuance of Federal Firearms Licenses.

94.     On or about January 5, 2016, Slide Fire obtained a Federal Firearms License that bears the signature of its founder, Jeremiah Cottle.[19]

95.     On the application for such a license, known as ATF Form 7, applicants must "[d]escribe the specific activity applicant is engaged in or intends to engage in, which requires a Federal Firearms License."

96.     To obtain a Type 7 License, which Slide Fire did, Slide Fire had to certify that it was applying as a "Manufacturer of Firearms Other than Destructive Devices."

97.     Such a certification by Slide Fire was and must have been false.

98.     The definition of "firearms" on ATF Form 7 (found in 18 U.S.C. § 921(a)(3)) refers solely to "firearms"; it does not include a "component part of a firearm", which is the classification that Slide Fire maintains that its "bump stock" devices meet by labeling "bump stocks" "accessories".

99.     Slide Fire's representation that it manufactures firearms is thus a false statement of a material fact because it formed the basis for ATF's issuance of a Federal Firearms License to Slide Fire as a "*Manufacturer* Of Firearms Other Than Destructive Devices." (emphasis added).

100.     Although Defendants assert that Slide Fire was a "manufacturer" of firearms, on information and belief, it was third parties, namely, Colt's Manufacturing LLC, Smith & Wesson Corp., and Eagle Arms that manufactured the firearms which Slide Fire sold.

---

[19] On February 23, 2018, Slide Fire filed a copy of its Federal Firearms License as Exhibit A to its Motion to Dismiss. *See* Ex. A to Slide Fire's Motion to Dismiss, ECF No. 8-2.

101.   Upon information and belief, Slide Fire's business model and profitability depended upon its ability to sell both firearms (which requires a Federal Firearms License) and firearms "accessories" like the "bump stocks."   In the absence of a Federal Firearms License, Slide Fire would not have been in operation and would not have sold the "bump stock" to Paddock.

102.   Upon information and belief, Slide Fire knowingly violated 18 U.S.C. 1001, 18 U.S.C. § 923(d)(1)(D), Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), Nev. Rev. Stat. § 104.2314, and Nev. Rev. Stat. § 598.0915 which violations proximately caused Plaintiffs' harm

103.   Upon information and belief, Slide Fire's knowing violations of 18 U.S.C. 1001, 18 U.S.C. § 923(d)(1)(D), Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), Nev. Rev. Stat. § 104.2314, and Nev. Rev. Stat. § 598.0915 all serve as predicate violations under PLCAA even if "bump stocks" were "qualified products" because Slide Fire's violation of both statutes was a direct and proximate cause of Plaintiffs' harm.

104.   Defendants negligently entrusted the bump stocks used by the Las Vegas killer.

105.   As a direct and proximate result of the acts and/or omissions of the Defendants, the Plaintiffs have suffered emotional distress.

106.   As a direct and proximate result of all the foregoing and as a result of the acts and/or omissions of Defendants, the Plaintiffs have sustained emotional damage wherein Plaintiffs require medical mental health monitoring.

107.   As a direct and proximate result of all the foregoing and as a result of the acts and/or omissions of Defendants, the Plaintiffs have sustained emotional damage in an amount to be determined for the initial testing for emotional distress and ongoing treatment.

108.   As a direct and proximate result of the Defendants' negligence the Plaintiffs and the putative Class Members seek, as a remedy all available relief, and equitable relief in the form

of the establishment of a court supervised program for medical psychological monitoring for all Class Members at the expense of the Defendants.

109.    The equitable remedy of medical monitoring is appropriate equitable relief for the Defendants' conduct since the prospective medical testing and evaluation would have been completely unnecessary but for the Defendants' negligent and reckless conduct described herein.

110.    The equitable remedy of medical monitoring is appropriate since it is undisputed in the medical/psychological community that there is significant clinical value for the Plaintiffs and the putative Class Members in the early detection and treatment of emotional distress.

111.    Medical mental health monitoring is an appropriate remedy pursuant to *Sadler v. Pacificare of Nevada*, 340 P.2d 264 (Nev. 2014).

112.    As a direct and proximate result of all the foregoing and as a result of the acts and/or omissions of Defendants, the Plaintiffs have sustained damage in an amount in excess of Fifteen thousand Dollars ($15,000.00).

113.    It has been necessary for Plaintiffs to retain the services of EGLET PRINCE and THE BRADY CENTER TO PREVENT GUN VIOLENCE to represent them and to bring this action, and Plaintiffs are entitled to recover attorneys' fees and cost incurred herein.

## VI.
## CLASS ACTION ALLEGATIONS

114.    <u>Class Definition</u>: Plaintiffs bring this class action on behalf of themselves and the class defined as follows:  All persons who, on October 1, 2017 ("Class Period") attended the Route 91 Harvest Festival and suffered emotional distress from being fired upon and/or witnessing the carnage, and injuries to family members, friends, and fellow concert goers. Excluded from the Class are those individuals sustaining only physical injuries, Defendants, members of the immediate families of the individual Defendants, and their legal representatives,

parents, affiliates, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest, and any other person who engaged in the wrongful conduct alleged herein (the "Excluded Persons").

115.    <u>Numerosity</u>: Upon information and belief, Plaintiffs allege that the total number of Class Members is dispersed in as well as outside of the United States. Consequently, joinder of the individual Class Members would be impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class such that the disposition of the individual claims of the respective Class Members through this Class action will benefit both the parties and this Court, and will facilitate judicial economy.

116.    <u>Ascertainability</u>: The Class is ascertainable because, on information and belief, each Class member who attended the Route 91 music Festival is kept and stored in a detailed electronic database and records.  Upon information and belief, and at all times relevant hereto, Festival attendees purchase tickets to the event, and were provided wristbands to allow for entry into the venue. These wristbands were electronically registered to each concertgoer. In other words, each concert attendee was required to register their respective wristbands so as to allow entrance into the Route 91 music festival.

117.    <u>Typicality</u>: Plaintiffs' claims are typical of the claims of the members of the Class. The claims of Plaintiffs' and the members of the Class are based on the same legal theories and arise from the same conduct. As such, the claims of Plaintiffs and the Class rise and fall together and are typical of one another.

118.    <u>Common Questions of Fact and Law Predominate</u>: Judicial determination of the common legal and factual issues essential to this case would be far more efficient and economical as a class action than in piecemeal individual determinations.  There is no plain,

24

speedy or adequate remedy other than by maintenance of this lawsuit as a class action because individual actions for medical mental health monitoring are relatively small, making it economically infeasible for Class Members to pursue remedies individually.  The prosecution of separate actions by individual Members of the Class, even if theoretically possible, would create a risk of inconsistent or varying adjudications with respect to the individual Class Members against Defendants and would establish incompatible standards of conduct for the Defendants. There are numerous questions of law or fact common to all Class Members including, but not limited to:

(a) Whether Defendants acted negligently when they designed, manufactured, marketed, distributed and/or sold its bump stock products;

(b) Whether Defendants acted negligently, or with deliberate indifference, when they sold, marketed, advertised, and/or otherwise promoted its bump stock products;

(c) Whether Defendants' product circumvents federal and state laws including background checks prohibiting certain individuals the ownership and use of fully automatic firearms; and

(d) Whether Defendants acted in an intentional, willful or wanton manner justifying an award of punitive damages.

These questions are susceptible to a common answer. These questions and others like them predominate over individual issues. The same evidence needed to prove Plaintiffs' individual claims will be used to prove the claims of all Class Members.

119. <u>Adequacy of Representation</u>: Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the members of the Class. Plaintiffs will fairly, adequately, and vigorously represent and protect the interests of the members of the Class and have no interests antagonistic to the members of the Class. Plaintiffs have retained

25

counsel who are competent and experienced in the prosecution of complex consumer class action litigation. Plaintiffs' attorneys have the resources, expertise and experience to prosecute this action, and do not have knowledge of any conflicts among the members of Plaintiffs' Class, or any conflicts between the Class and Plaintiffs' attorneys. Plaintiffs have no interests adverse to the interests of other Members of the Class and will fairly and adequately protect the interests of the Class. Plaintiffs have retained counsel experienced and competent in the prosecution of class actions and complex litigation.

120. <u>Superiority</u>: The Class action is superior to other available methods for the fair and efficient adjudication of this controversy because: (a) the prosecution of a multitude of separate actions would be inefficient and wasteful of judicial resources; (b) the members of the class may be scattered throughout the United States and are not likely to be able to vindicate and enforce their rights unless this actions is maintained as a class action; (c) the issues raised can be more fairly and efficiently resolved in the context of a single action rather than piece-meal litigation in the context of separate actions; (d) the resolution of litigation in a single forum will avoid the danger and resultant confusion of possible inconsistent determinations; (e) the prosecution of separate actions would create the risk of inconsistent or varying adjudications with respect to individuals pursuing claims against Defendants, which would establish incompatible standards of conducts for Defendants; (f) Defendants have acted and will act on grounds applicable to all Class Members; (g) Individual Class Members' medical mental health monitoring claims are relatively small and the expense and burden of individual litigation makes it impossible for Class Members individually to redress the wrongs done to them; and (h) questions of law and/or fact common to members of the Class, especially on issues of liability, predominate over any question, such as that of individuals damages that will affect individual Class Members.

## VII.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Negligence**
*Against all Defendants*

121.     Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter.

122.     Defendants owed Plaintiffs a duty of care to reasonably market, advertise, distribute and/or promote its bump stock products to prevent or minimize the risk of foreseeable injury to others.

123.     Defendants breached their duty of care by:

    (a) Failing to adequately and properly market, sell, advertise, and/or promote the bump stock as a device to help individuals with limited mobility to shoot certain firearms; or

    (b) Negligently marketing, advertising, selling, and/or promoting the bump stock as an inexpensive device to circumvent federal law in obtaining fully automatic weapons;

124.     As a direct and proximate result of the acts and/or omissions of the Defendants, the Plaintiffs have suffered emotional distress.

125.     As a direct and proximate result of all the foregoing and as a result of the acts and/or omissions of Defendants, the Plaintiffs have sustained emotional damage wherein Plaintiffs require medical mental health monitoring.

126.     As a direct and proximate result of all the foregoing and as a result of the acts and/or omissions of Defendants, the Plaintiffs have sustained emotional damage in an amount to be determined for the initial testing for emotional distress and ongoing treatment.

27

127.   As a direct and proximate result of the Defendants' negligence the Plaintiffs and the putative Class Members seek, as a remedy all available relief, and equitable relief in the form of the establishment of a court supervised program for medical psychological monitoring for all Class Members at the expense of the Defendants.

128.   The equitable remedy of medical monitoring is appropriate equitable relief for the Defendants' conduct since the prospective medical testing and evaluation would have been completely unnecessary but for the Defendants' negligent and reckless conduct describe herein.

129.   The equitable remedy of medical monitoring is appropriate since it is undisputed in the medical/psychological community that there is significant clinical value for the Plaintiffs and the putative Class Members in the early detection and treatment of emotional distress.

130.   Medical mental health monitoring is an appropriate remedy pursuant to *Sadler v. Pacificare of Nevada*, 340 P.2d 264 (Nev. 2014).

131.   As a direct and proximate result of all the foregoing and as a result of the acts and/or omissions of Defendants, the Plaintiffs have sustained damage in an amount in excess of Fifteen thousand Dollars ($15,000.00).

132.   It has been necessary for Plaintiffs to retain the services of EGLET PRINCE to represent them and to bring this action, and Plaintiffs are entitled to recover attorneys' fees and cost incurred herein.

## SECOND CLAIM FOR RELIEF
### Negligence Per Se
**Negligence Per Se Pursuant to Nev. Rev. Stat. § 104.2314 and Nev. Rev. Stat. § 598.0915**
*Against all Defendants*

133.   That Plaintiffs incorporate by this reference each and every allegation previously made in this Complaint, as if fully set forth herein.

134.   Pursuant to Nev. Rev. Stat. § 104.2314, a warranty of merchantability is implied

28

in the sale of goods where the seller is a merchant with respect to goods of that kind. To be merchantable, goods must "(c) [Be] fit for the ordinary purposes for which such goods are used." Nev. Rev. Stat. § 102.2314(2). By offering for sale and selling its bump stocks in Nevada, Slide Fire implied warranted that the bump stocks were merchantable.

135.    Defendants' bump stock device is not merchantable. Defendants' sale of the bump stock violates Nev. Rev. Stat. § 104.2314 because the bump stock is not fit for the ordinary purposes for which it is used.

136.    The bump stock converts otherwise legal firearms into deadly weapons that are capable of firing at rates that approximate fully automatic machineguns, without complying with the restrictions and regulations of the National Firearms Act. Slide Fire's bump stock is not merchantable because, as a firearms accessory with no utility other than to convert a firearm into a deadly machine gun, it is not suitable for buying and selling among the general public. The bump stock is not fit for any "ordinary purpose," because no product can be "fit" for the purpose of facilitating mass killing and/or enabling persons to evade federal law – the National Firearms Act.

137.    Plaintiffs belong to the class of persons whom Nev. Rev. Stat. § 104.2314 is designed to protect.

138.    As a direct and proximate result of Defendants' violation of Nev. Rev. Stat. § 104.2314, Plaintiffs have suffered emotional distress.

139.    As a direct and proximate result of all the foregoing and as a result of Defendants' violation of Nev. Rev. Stat. § 104.2314, Plaintiffs have sustained emotional damage wherein Plaintiffs require medical mental health monitoring.

140.    As a direct and proximate result of all the foregoing and as a result of Defendants' violation of Nev. Rev. Stat. § 104.2314, Plaintiffs have sustained emotional damage in an

amount to be determined for the initial testing for emotional distress and ongoing treatment.

141.    As a direct and proximate result of the Defendants' violation of Nev. Rev. Stat. § 104.2314 the Plaintiffs and the putative Class Members seek, as a remedy all available relief, and equitable relief in the form of the establishment of a court supervised program for medical psychological monitoring for all Class Members at the expense of the Defendants.

142.    Defendants knew and/or should have known that the bump stock device converted legal firearms into weapons with machinegun rate-of-fire capabilities.

143.    Defendants knew and/or should have known that by marketing, promoting, distributing, selling and/or advertising this dangerous and deadly product to the general public, Defendants violated Nev. Rev. Stat. § 104.2314 because their product was not fit for its the unregulated and unlimited use by the general public.

144.    Pursuant to Nev. Rev. Stat. §598.0915(5), a defendant engages in a deceptive trade practice if it "[k} knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or entities of goods or services for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith.

145.    By creating the false and misleading impression that the bump stock device could be used by members of the public for a lawful, safe purpose in marketing and selling its bump stock device, Slide Fire has knowingly violated Nev. Rev. Stat. §598.0915(5).

146.    By displaying the "ATF Approved" legend on its homepage and discussing the ATF letter under the "Legality and Purchasing" section of its FAQ' s, Slide Fire also knowingly created the false and misleading impression that the ATF letter was an official approval of the legality of the bump stock in violation of Nev. Rev. Stat. §598.0915(5).

30

147.   Plaintiffs belong to the class of persons whom Nev. Rev. Stat. § 598.0915(5) is designed to protect.

148.   That at all times mentioned herein, Defendants, and each of them, acted with fraud, oppression, and/or malice toward Plaintiffs, exhibited an intention and willingness to injure Plaintiffs and/or a conscious disregard for the rights and safety of the Plaintiffs, and each Defendant, should be punished and made an example of by imposition of treble damages in an amount in excess of $15,000.00.   Plaintiffs are entitled to attorney's fees because this is an exceptional case pursuant to Section 1117 of the Lanham Act.

149.   The equitable remedy of medical monitoring is appropriate equitable relief for the Defendants' conduct since the prospective medical testing and evaluation would have been completely unnecessary but for the Defendants' negligent and reckless conduct describe herein.

150.   The equitable remedy of medical monitoring is appropriate since it is undisputed in the medical/psychological community that there is significant clinical value for the Plaintiffs and the putative Class Members in the early detection and treatment of emotional distress.

151.   Medical mental health monitoring is an appropriate remedy pursuant to *Sadler v. Pacificare of Nevada*, 340 P.2d 264 (Nev. 2014).

152.   As a direct and proximate result of all the foregoing and as a result of the acts and/or omissions of Defendants, the Plaintiffs have sustained damage in an amount in excess of Fifteen thousand Dollars ($15,000.00).

153.   It has been necessary for Plaintiffs to retain the services of EGLET PRINCE to represent them and to bring this action, and Plaintiffs are entitled to recover attorneys' fees and cost incurred herein.

///

///

31

### THIRD CLAIM FOR RELIEF
**Negligent Infliction of Emotional Distress (Bystander)**
*Against all Defendants*

154.   That Plaintiffs incorporate by this reference each and every allegation previously made in this Complaint, as if fully set forth herein.

155.   Defendants owed Plaintiffs a duty of care to reasonably market, sell, advertise, distribute and/or promote its bump stock products to prevent or minimize the risk of foreseeable injury to others.

156.   Defendants breached their duty of care by:

(a) Failing to adequately and properly market, sell, advertise, and/or promote the bump stock as a device to help individuals with limited mobility to shoot certain firearms; or

(b) Negligently marketing, advertising, selling, and/or promoting the bump stock as an inexpensive device to circumvent federal law in obtaining fully automatic weapons;

157.   That each Plaintiff and all of those similarly situated were concert attendees of the Route 91 music festival.

158.   That each Plaintiff and all of those similarly situated witnessed the carnage and death of loved ones, family members, friends and fellow concertgoers, and suffered a shock resulting from the sensory and observance of the carnage.

159.   That each Plaintiff and all of those similarly situated witnessed the injuries of loved ones, family members, friends and fellow concertgoers, and suffered a shock resulting from the sensory and observance of the carnage.

160.   That the acts and/or omissions of the Defendants as described herein, constitute negligent infliction of emotional distress and the Plaintiffs and those similarly situated have suffered emotional distress as a direct and proximate result of the actions described hereinabove.

161.   That it was reasonably foreseeable to the Defendants under the facts and

circumstances of this case, that Slide Fire's bump stock patented technology would be used to convert a semi-automatic firearm to one capable of firing continuously and without interruption and to be used as a weapon to fire upon innocent civilians.

162.    That as a result of the negligent infliction of emotional distress identified hereinabove, Plaintiffs and those similarly situated have been directly and proximately damaged.

163.    As a direct and proximate result of all the foregoing and as a result of the acts and/or omissions of Defendants, the Plaintiffs have sustained damage in an amount to be determined for the initial testing of emotional distress and ongoing treatment.

164.    As a direct and proximate result of the Defendants' negligence the Plaintiffs and the putative Class Members seek, as a remedy all available relief, and equitable relief in the form of the establishment of a court supervised program for medical psychological monitoring for all Class Members at the expense of the Defendants.

165.    The equitable remedy of medical monitoring is appropriate equitable relief for the Defendants' conduct since the prospective medical testing and evaluation would have been completely unnecessary but for the Defendants' negligent and reckless conduct describe herein.

166.    The equitable remedy of medical monitoring is appropriate since it is undisputed in the medical/psychological community that there is significant clinical value for the Plaintiffs and the putative Class Members in the early detection and treatment of emotional distress.

167.    Medical mental health monitoring is an appropriate remedy for the actions, inactions, and negligence of Defendants under *Sadler v. Pacificare of Nevada*, 340 P.2d 264 (Nev. 2014).

168.    That the aforementioned acts were conducted in a wanton, willful, malicious manner, with conscious disregard for Plaintiffs' rights and the rights of those similarly situated. The acts of Defendants and each of them should be assessed punitive or exemplary damages.

33

169.     That Plaintiffs and those similarly situated have been forced to retain the services of an attorney and to represent them in this action, and as such are entitled to reasonable attorneys fees and litigation costs.

**FOURTH CLAIM FOR RELIEF**
**Negligent Infliction of Emotional Distress (Direct)**
*Against all Defendants*

170.     That Plaintiffs incorporate by this reference each and every allegation previously made in this Complaint, as if fully set forth herein.

171.     Defendants owed Plaintiffs a duty of care to reasonably market, sell, advertise, distribute and/or promote its bump stock products to prevent or minimize the risk of foreseeable injury to others.

172.     Defendants breached their duty of care by:

a.   Failing to adequately and properly market, sell, advertise, and/or promote the bump stock as a device to help individuals with limited mobility to shoot certain firearms; or

b.   Negligently marketing, advertising, selling and/or promoting the bump stock as an inexpensive device to circumvent federal law in obtaining fully automatic weapons;

173.     That each Plaintiff and all of those similarly situated were concert attendees of the Route 91 music festival.

174.     That each Plaintiff and all of those similarly situated suffered severe emotional distress as multiple bullets per minute were fired down upon them and the crowd of other concert attendees.

175.     That the acts and/or omissions of the Defendants as described herein, constitute negligent infliction of emotional distress and the Plaintiffs and those similarly situated have suffered emotional distress as a direct and proximate result of the actions described hereinabove.

34

176.    That it was reasonably foreseeable to the Defendants under the facts and circumstances of this case, that Slide Fire's bump stock patented technology would be used to convert a semi-automatic firearm to one capable of firing continuously and without interruption and to be used as a weapon to fire upon innocent civilians.

177.    That as a result of the negligent infliction of emotional distress identified hereinabove, Plaintiffs and those similarly situated have been directly and proximately damaged.

178.    As a direct and proximate result of all the foregoing and as a result of the acts and/or omissions of Defendants, the Plaintiffs have sustained damage in an amount to be determined for the initial testing of emotional distress and ongoing treatment.

179.    As a direct and proximate result of the Defendants' negligence the Plaintiffs and the putative Class Members seek, as a remedy all available relief, and equitable relief in the form of the establishment of a court supervised program for medical psychological monitoring for all Class Members at the expense of the Defendants.

180.    The equitable remedy of medical monitoring is appropriate equitable relief for the Defendants' conduct since the prospective medical testing and evaluation would have been completely unnecessary but for the Defendants' negligent and reckless conduct describe herein.

181.    The equitable remedy of medical monitoring is appropriate since it is undisputed in the medical/psychological community that there is significant clinical value for the Plaintiffs and the putative Class Members in the early detection and treatment of emotional distress.

182.    Medical mental health monitoring is an appropriate remedy for the actions, inactions, and negligence of Defendants under *Sadler v. Pacificare of Nevada*, 340 P.2d 264 (Nev. 2014).

183.    That the aforementioned acts were conducted in a wanton, willful, malicious manner, with conscious disregard for Plaintiffs' rights and the rights of those similarly situated.

184.    The acts of Defendants and each of them should be assessed punitive or exemplary damages.

185.    That Plaintiffs and those similarly situated have been forced to retain the services of EGLET PRINCE and THE BRADY CENTER TO PREVENT GUN VIOLENCE and to represent them in this action, and as such are entitled to reasonable attorneys fees and litigation costs.

**FIFTH CLAIM FOR RELIEF**
**Negligent Entrustment Of A Dangerous Instrument**
*Against All Defendants*

186.    That Plaintiffs incorporate by this reference each and every allegation previously made in this Complaint, as if fully set forth herein.

187.    The "bump stock" is a dangerous instrument.  It serves no lawful, legitimate interest in the hands of the general public.  Michael Bouchard, former Assistant Director of the Bureau of Alcohol, Tobacco Firearms and Explosives has said, "[a 'bump stock'] serves no purpose for anything[.]  Not for sporting, not for target practice, not for hunting."[20]

188.    Slide Fire recognized that bump stocks have no lawful, legitimate purpose for able-bodied people when it emphasized its supposed utility to those with limited mobility in their hands.

189.    If a member of the public purchased a "bump stock," that inherently indicated that the purchaser intended to use the "bump stock" in a violent crime like the Las Vegas shooting.

190.    Defendants knowingly supplied or negligently entrusted a dangerous instrument, namely, the bump stock, to purchasers such as Paddock, whose possession of the bump stock created an unreasonable risk of harm to the public, and those who would supply such people

---

[20] Washington Post article dated October 5, 2017, "NRA Support for Restricting 'Bump Stocks' Reflects Impact of Las Vegas Massacre."

with bump stocks.

191.   Paddock ultimately used that instrument in a foreseeable, dangerous way that harmed Plaintiffs.

192.   As a direct and proximate result of all the foregoing and as a result of the acts and/or omissions of Defendants, the Plaintiffs have sustained damage in an amount to be determined for the initial testing of emotional distress and ongoing treatment.

193.   As a direct and proximate result of the Defendants' negligence the Plaintiffs and the putative Class Members seek, as a remedy all available relief, and equitable relief in the form of the establishment of a court supervised program for medical psychological monitoring for all Class Members at the expense of the Defendants.

194.   The equitable remedy of medical monitoring is appropriate equitable relief for the Defendants' conduct since the prospective medical testing and evaluation would have been completely unnecessary but for the Defendants' negligent and reckless conduct describe herein.

195.   The equitable remedy of medical monitoring is appropriate since it is undisputed in the medical/psychological community that there is significant clinical value for the Plaintiffs and the putative Class Members in the early detection and treatment of emotional distress.

196.   Medical mental health monitoring is an appropriate remedy for the actions, inactions, and negligence of Defendants under *Sadler v. Pacificare of Nevada*, 340 P.2d 264 (Nev. 2014).

197.   That the aforementioned acts were conducted in a wanton, willful, malicious manner, with conscious disregard for Plaintiffs' rights and the rights of those similarly situated.

198.   The acts of Defendants and each of them should be assessed punitive or exemplary damages.

37

199.    That Plaintiffs and those similarly situated have been forced to retain the services of EGLET PRINCE and THE BRADY CENTER TO PREVENT GUN VIOLENCE and to represent them in this action, and as such are entitled to reasonable attorneys fees and litigation costs.

### SIXTH CLAIM FOR RELIEF
**Negligent Products Liability—Unreasonably Dangerous Product**
*Against all Defendants*

200.    That Plaintiffs incorporate by this reference each and every allegation previously made in this Complaint, as if fully set forth herein.

201.    That Defendants, and each of them, owed a duty to Plaintiffs to exercise reasonable care in the manufacture and/or design and/or sale of bump stocks to ensure that it was safe for its intended and reasonably foreseeable use.

202.    That the Defendants, and each of them, negligently manufactured, and/or designed, and/or sold, and/or packaged, and/or distributed the subject bump stocks such that they were dangerous and unsafe for their intended use and/or reasonably foreseeable use.

203.    That the Defendants' product failed to perform in a manner reasonably to be expected in light of its nature and intended function and was more dangerous than would be contemplated by the ordinary consumer and/or ordinary user and/or member of the public having the ordinary knowledge available in the community.

204.    That Defendants, and each of them, failed to exercise the amount of care in the design and/or manufacture and/or distribution and/or sale of the bump stock, that a reasonably careful manufacturer and/or designer and/or seller would have used in similar circumstances to avoid exposing consumers and/or users to a foreseeable risk of harm.

205.    As a direct and proximate result of all the foregoing and as a result of the acts and/or omissions of Defendants, the Plaintiffs have sustained damage in an amount to be

determined for the initial testing of emotional distress and ongoing treatment.

206.    As a direct and proximate result of the Defendants' negligence, the Plaintiffs and the putative Class Members seek, as a remedy all available relief, and equitable relief in the form of the establishment of a court supervised program for medical psychological monitoring for all Class Members at the expense of the Defendants.

207.    The equitable remedy of medical monitoring is appropriate equitable relief for the Defendants' conduct since the prospective medical testing and evaluation would have been completely unnecessary but for the Defendants' negligent and reckless conduct describe herein.

208.    The equitable remedy of medical monitoring is appropriate since it is undisputed in the medical/psychological community that there is significant clinical value for the Plaintiffs and the putative Class Members in the early detection and treatment of emotional distress.

209.    Medical mental health monitoring is an appropriate remedy for the actions, inactions, and negligence of Defendants under *Sadler v. Pacificare of Nevada*, 340 P.2d 264 (Nev. 2014).

210.    That as a direct and proximate cause of Defendants negligence, Plaintiffs now suffered, and will continue to suffer, severe emotional distress, which are damages recoverable by Plaintiff, an amount in excess of Fifteen thousand Dollars ($15,000.00).

211.    That the aforementioned acts were conducted in a wanton, willful, malicious manner, with conscious disregard for Plaintiffs' rights and the rights of those similarly situated. The acts of Defendants and each of them should be assessed punitive or exemplary damages.

212.    It has been necessary for Plaintiffs to retain the services of EGLET PRINCE to represent them and to bring this action, and Plaintiffs are entitled to recover attorney's fees and costs incurred herein.

///

## SEVENTH CLAIM FOR RELIEF
### Strict Products Liability – Defective Product
*Against all Defendants*

213.     That Plaintiffs incorporate by this reference each and every allegation previously made in this Complaint, as if fully set forth herein.

214.     Defendants placed upon the market the bump stocks which are defective and an unreasonably dangerous product.

215.     Plaintiffs' injuries were caused by the defect in Defendants' product.

216.     The defect existed when the product left the hands of the Defendants.

217.     But for the defect, Plaintiffs would not have suffered damages.

218.     Defendants knew and/or should have know that by marketing, promoting, distributing, selling and/or advertising its defective product as one to circumvent federal law, it was foreseeable to Defendants that the individuals would use such a device not for its intended purpose.

219.     As a direct and proximate result of all the foregoing and as a result of the acts and/or omissions of Defendants, the Plaintiffs have sustained damage in an amount to be determined for the initial testing of emotional distress and ongoing treatment.

220.     As a direct and proximate result, Plaintiffs and the putative Class Members seek, as a remedy all available relief, and equitable relief in the form of the establishment of a court supervised program for medical psychological monitoring for all Class Members at the expense of the Defendants.

221.     The equitable remedy of medical monitoring is appropriate equitable relief for the Defendants' conduct since the prospective medical testing and evaluation would have been completely unnecessary but for the Defendants' defective product described herein.

222.     The equitable remedy of medical monitoring is appropriate since it is undisputed

in the medical/psychological community that there is significant clinical value for the Plaintiffs and the putative Class Members in the early detection and treatment of emotional distress.

223.     Medical mental health monitoring is an appropriate remedy for the actions, inactions, and negligence of Defendants under *Sadler v. Pacificare of Nevada*, 340 P.2d 264 (Nev. 2014).

224.     As a direct and proximate result of all the foregoing and as a result of the acts and/or omissions of Defendants, the Plaintiffs have sustained damage in an amount in excess of Fifteen thousand Dollars ($15,000.00).

225.     It has been necessary for Plaintiffs to retain the services of EGLET PRINCE to represent them and to bring this action, and Plaintiffs are entitled to recover attorney's fees and costs incurred herein.

### EIGHTH CLAIM FOR RELIEF
**Public Nuisance**
*Against all Defendants*

226.     That Plaintiffs incorporate by this reference each and every allegation previously made in this Complaint, as if fully set forth herein.

227.     Nevada law provides that a public nuisance is "[e]very act unlawfully done and every omission to perform a duty, which act or omission:

(a) Annoys, injures or endangers the safety, health, comfort or repose of any considerable number of persons;

(b) Offends public decency;

(c) Unlawfully interferes with, befouls, obstructs or tends to obstruct, or renders dangerous for passage, a lake, navigable river, bay, stream, canal, ditch, millrace or basin, or a public park, square, street, alley, bridge, causeway or highway; or

(d) In any way renders a considerable number of persons insecure in life or the use of

41

property."

228.    By negligently, recklessly, and/or intentionally manufacturing, marketing, or selling products or defective products that enable rapid fire akin to a machine gun in a manner that ensures a steady flow of dangerous products in large quantities to persons with criminal purposes, Defendants have negligently and/or knowingly violated Nevada law thereby participating in creating and maintaining an unreasonable interference with the rights held in common by the general public, constituting a public nuisance under Nevada law. Without limitation, the acts and omissions of the Defendants as alleged herein caused, created, and maintains substantial and unreasonable interference with the public's health, safety, convenience, comfort, peace, and use of public property and/or private property.

229.    The acts and omissions of Defendants as alleged herein substantially and unreasonably interfere with the public's use of public facilities, including the use of public highways and walkways. Public highways and walkways are substantially and unreasonably unsafe because of the presence of materials illegally sold and negligently supplied by Defendants. Defendants' acts and omissions as alleged herein substantially and unreasonably (a) increase the number of criminal attacks in and on public facilities, including on public highways and walkways, and (b) increase the degree to which unlawful possessors in and on public facilities, including on highways and walkways, are illegally armed with weapons.

230.    Defendants' actions in negligently, recklessly, and/or intentionally providing ammunition to supply persons with criminal purposes constitute an ongoing and substantial threat to public safety and welfare because such materials are used in crimes where they continue to cause harm to innocent victims such as the plaintiffs.

231.    Numerous members of the public are killed, injured, or involved in criminal acts each year as a result of materials negligently and intentionally sold and entrusted by the

Defendants. Defendants' acts and omissions as alleged herein cause a substantial and unreasonable increase in the number of members of the general public who are killed and injured.

232. Defendants' acts and omissions as alleged herein cause substantial and unreasonable interferences with the public's health, safety, convenience, comfort, and peace in numerous other ways, including: (a) increasing the number of unlawful possessors of weapons who commit violent crimes against innocent members of the general public; (b) increasing the number and severity of property crimes committed by those in possession of crime guns against innocent members of the general public; (c) increasing the number and severity of incidents in which those in possession of crime guns disturb the peace by being disorderly; and (d) increasing the amount of society's resources that are diverted toward dealing with the problems associated with the possession of ammunition and other dangerous products negligently and intentionally sold by the defendant sellers.

233. The Defendants know or have reason to know that the acts and omissions alleged herein caused substantial and unreasonable interferences with the public's health, safety, convenience, comfort, peace, and use of public facilities. The Defendants' acts and omissions as alleged herein were undertaken with negligent and/or intentional disregard of the rights of the general public. Defendants knew that they could have taken precautions that would have eliminated or minimized the injuries to the general public but they chose not to take those precautions in order to maximize their revenues and profits.

234. The Defendants' interference with the public's health, safety, convenience, comfort, peace, and use of public facilities is unreasonable, unlawful, substantial, significant, continuing, and long-lasting. This interference is not insubstantial or fleeting, and involves deaths and serious injuries suffered by many people and a severe disruption of public peace,

order, and safety.

235.     The Defendants' negligence and unlawful conduct is a cause of the public nuisance.

236.     As a direct and proximate result of all the foregoing and as a result of the acts and/or omissions of Defendants, the Plaintiffs have sustained damage in an amount in excess of Fifteen thousand Dollars ($15,000.00).

237.     That at all times mentioned herein, Defendants, and each of them, acted with fraud, oppression, and/or malice toward Plaintiffs, exhibited an intention and willingness to injure Plaintiffs and/or a conscious disregard for the rights and safety of the Plaintiffs, and each Defendant, should be punished and made an example of by imposition of punitive or exemplary damages in an amount in excess of $15,000.00.

238.     It has been necessary for Plaintiffs to retain the services of EGLET PRINCE to represent them and to bring this action, and Plaintiffs are entitled to recover attorney's fees and costs incurred herein.

### NINTH CLAIM FOR RELIEF
**Private Nuisance**
*Against all Defendants*

239.     That Plaintiffs incorporate by this reference each and every allegation previously made in this Complaint, as if fully set forth herein.

240.     Nevada law provides that "[e]xcept as otherwise provided in this section:

(a) Anything which is injurious to health, or indecent and offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property . . . is a nuisance, and the subject of an action.  The action may be brought by any person whose property is injuriously affected, or whose personal enjoyment is lessened by the nuisance, and by the judgment the

nuisance may be enjoined or abated, as well as damages recovered."

241.     By negligently, recklessly, and/or intentionally manufacturing, marketing, or selling products or defective products that enable rapid fire akin to a "machinegun" in a manner that ensures a steady flow of dangerous products in large quantities to persons with criminal purposes, Defendants have negligently and/or knowingly violated Nevada law, thereby creating and maintaining a substantial and unreasonable interference with Plaintiffs' comfortable enjoyment of life or property, constituting a private nuisance under Nevada law.   Without limitation, the acts and omissions of the Defendants as alleged herein caused, created, and maintained substantial and unreasonable interference with the Plaintiffs' life, health, safety, convenience, comfort, peace, and use of property.

242.     Defendants' actions in negligently, recklessly, and/or intentionally providing "bump stocks" to supply persons with criminal purposes constitute an ongoing and substantial threat to the Plaintiffs' safety and welfare because such materials are used in crimes where they continue to cause harm to innocent victims.

243.     Defendants' acts and omissions as alleged herein cause substantial and unreasonable interference with the Plaintiffs' life, health, safety, convenience, comfort, and peace in numerous other ways, including: (a) increasing the number of unlawful possessors of weapons who commit violent crimes; (b) increasing the number and severity of property crimes committed by those in possession of crime guns; (c) increasing the number and severity of incidents in which those in possession of crime guns disturb the peace by being disorderly; and (d) increasing the amount of society's resources that are diverted toward dealing with the problems associated with the possession of ammunition and other dangerous products negligently and unlawfully sold by the Defendants.

244.    The Defendants know or have reason to know that the acts and omissions alleged herein caused substantial and unreasonable interference with the Plaintiffs' life, health, safety, convenience, comfort, peace, and use of property.  The Defendants' acts and omissions as alleged herein were undertaken with negligent and/or intentional disregard of the rights of the Plaintiffs.  Defendants knew that they could have taken precautions that would have eliminated or minimized the injuries to the Plaintiffs, but they chose not to take those precautions in order to maximize their profits.

245.    The Defendants' interference with the Plaintiffs' life, health, safety, convenience, comfort, peace, and use of property is unreasonable, unlawful, substantial, significant, continuing, and long-lasting.  This interference is not insubstantial or fleeting, and involves serious injuries suffered by the Plaintiffs and a severe disruption of their comfortable enjoyment of life and property.

246.    The Defendants' negligence and unlawful conduct is a cause of the private nuisance against the Plaintiffs.  But for the Defendants' negligent and fraudulent advertising, marketing, and manufacturing of (and misrepresentations related to) the "bump stock," such a product would not have been available for use by Paddock. and the rapid nature and intensity of the shooting enabled by Paddock's use of the bump stock devices would not have constituted a substantial and unreasonable interference of the Plaintiffs' comfortable enjoyment of life and property.

247.    As a direct and proximate result of all the foregoing and as a result of the acts and/or omissions of Defendants, the Plaintiffs have sustained damage in an amount in excess of Fifteen thousand Dollars ($15,000.00).

248.    That at all times mentioned herein, Defendants, and each of them, acted with fraud, oppression, and/or malice toward Plaintiffs, exhibited an intention and willingness to

injure Plaintiffs and/or a conscious disregard for the rights and safety of the Plaintiffs, and each Defendant should be punished and made an example of by imposition of punitive or exemplary damages in an amount in excess of $15,000.00.

249.     It has been necessary for Plaintiffs to retain the services of EGLET PRINCE [BRADY] to represent them and to bring this action, and Plaintiffs are entitled to recover attorney's fees and costs incurred herein.

## TENTH CLAIM FOR RELIEF
### False Advertising in Violation of Section 43(a) of the Lanham Act
*Against all Defendants*

250.     That Plaintiffs incorporate by this reference each and every allegation previously made in this Complaint, as if fully set forth herein.

251.     Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) provides that:

(a) "Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which— . . .

(c) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

(d) shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."

252.     Upon information and belief, Defendants have made false or misleading factual representations about the characteristics or qualities of its own bump stock devices and of the purchase thereof, including without limitation that purchasers may acquire bump stock devices from Slide Fire lawfully without submitting to required background checks, that caused actual

deception or were likely to deceive relevant consumers.  Slide Fire did not mention that its purported 'ATF Approved' legend on its website was obtained through its false claim that its device was intended for those with limited mobility in their hands.

253.    Defendants knowingly violated the Act by making these representations in commercial advertising or promotion, in connection with products or services, and in interstate commerce.

254.    Defendants' representations were material, that is, they were likely to affect relevant consumers' purchasing decisions.

255.    Plaintiffs have been or are likely to be damaged by Defendants' misrepresentations.  On information and belief, Plaintiffs were deprived of their ability to carry on their commercial businesses because of the emotional trauma they experienced as a result of defendants' sale of the bump stock device and its subsequent use by the shooter, Stephen Paddock, in reliance on Defendants' misrepresentations that their methods of sale of the bump stocks were lawful, and because the Defendants, through their manufacture and sale of bump stock devices, have furnished the general public with unlimited and unregulated access to fully automatic machineguns.

256.    As a direct and proximate result of all the foregoing and as a result of the acts and/or omissions of Defendants, the Plaintiffs have sustained damage in an amount in excess of Fifteen thousand Dollars ($15,000.00).

257.    That at all times mentioned herein, Defendants, and each of them, acted with fraud, oppression, and/or malice toward Plaintiffs, exhibited an intention and willingness to injure Plaintiffs and/or a conscious disregard for the rights and safety of the Plaintiffs, and each Defendant, should be punished and made an example of by imposition of treble damages in an

1   amount in excess of $15,000.00.  Plaintiffs are entitled to attorney's fees because this is an

2   exceptional case pursuant to Section 1117 of the Lanham Act.

3       258.    It has been necessary for Plaintiffs to retain the services of EGLET PRINCE and

4   the BRADY CENTER TO PREVENT GUN VIOLENCE to represent them and to bring this

5   action, and Plaintiffs are entitled to recover attorney's fees and costs incurred herein.

6

7                          **ELEVENTH CLAIM FOR RELIEF**
                **Deceptive Trade Practice Pursuant to Nev. Rev. Stat. §598.0915**
8                           *Against Defendant Slide Fire*

9       259.    That Plaintiffs incorporate by this reference each and every allegation previously

10  made in this Complaint, as if fully set forth herein.

11

12      260.    Pursuant to Nev. Rev. Stat. §598.0915(5), a defendant engages in a deceptive

13  trade practice if it "[k]nowingly makes a false representation as to the characteristics,

14  ingredients, uses, benefits, alterations or entities of goods or services for sale or lease or a false

15  representation as to the sponsorship, approval, status, affiliation or connection of a person

16  therewith."

17

18      261.    By creating the false and misleading impression that the bump stock device could

19  be used by members of the public for a lawful, safe purpose in marketing and selling its bump

20  stock device, Slide Fire has knowingly violated Nev. Rev. Stat. §598.0915(5).

21      262.    By displaying the "ATF Approved" legend on its homepage and discussing the

22  ATF letter under the "Legality and Purchasing" section of its FAQ' s, Slide Fire also knowingly

23  created the false and misleading impression that the ATF letter was an official approval of the

24  legality of the bump stock in violation of Nev. Rev. Stat. §598.0915(5).

25

26      263.    Plaintiffs belong to the class of persons whom Nev. Rev. Stat. § 598.0915(5) is

27  designed to protect.

28

49

264.    As a direct and proximate result of Defendants' violation of Nev. Rev. Stat. § 598.0915, the Plaintiffs have sustained damage in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

265.    That at all times mentioned herein, Defendants, and each of them, acted with fraud, oppression, and/or malice toward Plaintiffs, exhibited an intention and willingness to injure Plaintiffs and/or a conscious disregard for the rights and safety of the Plaintiffs, and each Defendant, should be punished and made an example of by imposition of treble damages in an amount in excess of $15,000.00.

266.    It has been necessary for Plaintiffs to retain the services of EGLET PRINCE and the BRADY CENTER TO PREVENT GUN VIOLENCE to represent them and to bring this action, and Plaintiffs are entitled to recover attorney's fees and costs incurred herein.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs and those similarly situated pray for relief and damages as follows:

A.  That the Court determine this action is a proper class action and appoint Plaintiffs as representatives of the Class under Rule 23 of the Nevada Rules of Civil Procedure;

B.  For declaratory and equitable relief in the form of the establishment of a court supervised program for medical/psychological monitoring program for all Class Members at the Defendant' expense, in excess of fifteen thousand dollars ($15,000.00);

C.  That Plaintiffs and the Plaintiffs' Class be awarded treble damages, reasonable attorney's fees, and be awarded their costs of court;

D.  That Plaintiffs and the Plaintiffs' Class be awarded punitive damages;

///

///

///

50

1  All such other and further relief as this Court deems just and proper under the circumstances,

2  including, without limitation, post-judgment attorney's fees and costs.

3  DATED October 8th, 2018

4

5                                          Respectfully submitted,

6                                          **EGLET PRINCE**

7

8

9                                          **ROBERT T. EGLET, ESQ.**
                                           Nevada Bar No. 3402
10                                         **ROBERT M. ADAMS, ESQ.**
                                           Nevada Bar No. 6551
11                                         **CASSANDRA S.M. CUMMINGS, ESQ.**
                                           Nevada Bar No. 11944
12
                                           **RICHARD K. HY, ESQ.**
13                                         Nevada Bar No. 12406
                                           400 South Seventh Street, Box 1, Suite 400
14                                         Las Vegas, Nevada 89101

15

16

17

18

19

20

21

22

23

24

25

26

27

28